UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

_____
                                          )
**UNITED STATES OF AMERICA,**             )
                                          )
                                          )
                                          )
         **v.**                           )   Criminal No. 13-10097-DJC
                                          )
**ERNEST FIELDS,**                        )
                                          )
         **Defendant.**                   )
                                          )
_____)

## MEMORANDUM AND ORDER

**CASPER, J.**                                                    **June 11, 2014**

### I.    Introduction

Defendant Ernest Fields ("Fields") has moved to suppress the fruits of the search of his person on September 12, 2012. D. 40. Having considered the motion, the government's opposition, D. 48, the evidence (including testimony and exhibits) presented at the evidentiary hearing on the motion and oral argument D. 49, 56, and the supplement filings, D. 54, 55, the Court DENIES the motion. Accordingly, the Court makes its findings of fact and legal analysis below.

### II.   Findings of Fact

These findings are based upon the testimony of Boston Police Department ("BPD") Officers Joseph Fisher and Steven Dodd who testified at the suppression hearing and the exhibits introduced at that hearing.

On September 12, 2012 in the early morning hours, several officers of the BPD were on patrol in Roxbury in the area in and around Madison Park High School ("Madison Park" or "the school"). Members of the B-2 squad had been informed at the beginning of the shift by Sergeant

1

McCarthy that there had been a complaint from the Department of Youth and Families (located in the Madison Park complex) that people had been gathering at the back of the school and that there may have been drug activity and some overnight sleeping in that area.

With this information, BPD officers from the B-2 district headed to the area of Madison Park as part of their patrol. Around 1:30 a.m., BPD Officers Dodd, Hunter and McCarthy drove to the rear of the Madison Park complex and saw eight to ten individuals including one whom Dodd recognized to be gang-involved. Dodd did not see Fields as part of his initial observation of this group. Dodd and the other two officers set up surveillance in this area and requested the assistance of other officers, including Officers Dias, MacDougall and Jackson, to assist with such surveillance. These officers set up surveillance in vehicles in various locations around the school. At some point, Dodd and Hunter get out of their vehicle and walked up closer to the school's athletic field where they heard a group of male voices from the top of the field toward Madison Park. After these observations, Dodd and Hunter walked on the field and toward Madison Park, but did not find anyone. These two officers made their way to the front of the school and radioed to the other units to cover the front of the school. As they made their way closer to Malcolm X Boulevard, they heard a group of voices moving toward Roxbury Heritage Park ("the Park"). Given that it was around 1:30, 1:40 in the morning and the area was otherwise deserted and the officers had heard the group of voices moving from Madison Park toward the Park, Officer Dodd believed that the group moving toward the Park was the same one that they had observed earlier. Again, Officer Dodd radioed that the group may be moving toward Roxbury Street. One of the officers to respond to this radio call was Officer Fisher.

Officer Fisher, working with a K-9 unit, was also on routine patrol in the area. On the police radio, he had heard the other officers observing a group at and then leaving Madison Park,

heading toward the Park. He was aware that the Park closes after dark so that anyone there at that time would be trespassing. He headed to Roxbury Street and parked on the street, behind the Park, facing up the street. At this location, Officer Fisher continued to listen to the radio transmissions. Shortly thereafter, he observed a group of six to eight individuals coming from the direction of the Park (and reasonably assumed that they were coming from the Park) and walk onto to Roxbury Street, where he was parked. All but one of these individuals turned right, heading down the street away from where he was parked. One of the group, an individual later identified as the Defendant, Fields, turned left and headed up the street toward where Fisher's marked police cruiser was parked.

Fields was wearing a white T-shirt, jeans and was carrying a cell phone. As Fisher was passing the cruiser, Officer Fisher got out of the vehicle, heading toward the back of the vehicle and called out to Fields, "Hey, what's going on tonight?" Fields turned back toward the officer to respond so that they were approximately three feet apart during this exchange. Fields said that he was heading to his mother's house. When Officer Fisher asked where that residence was located, Fields responded with an address which the officer could not recall, but which was in the general direction in which he was headed. As the exchange continued, Fisher observed that the conversation became "one-sided" as Fields offered that he was not comfortable with the police and that they made him nervous, even showing that his hands were shaking. Fields mentioned something about the police having killed someone in the South End. Although the officer had not mentioned searching him, Fields warned the officer that he would need a reason to search him. Officer Fisher observed that Fields had become animated and repetitive in his comments. At this point, the officer had made no commands to Fields, had not requested any identification,

had no physical contact with him, had not blocked his path down the street and he had kept his firearm holstered throughout the exchange.

Given the nature and tone of Fields' comments and his observations of his agitation, Fisher became concerned and, using the radio on his police vest, requested backup from other officers. Within a minute, several other officers—BPD Officers Dodd, Hunter, MacDougall and Dias--arrived on the scene. Although Fisher's testimony differed in some respects from Dodd's about where the other officers came to stand when they arrived, Fisher testified, credibly, that even with the initial arrival of these other officers (who came across Malcolm X Boulevard and went up the stairs that led toward the Park and Roxbury Street), there was nothing between Fields and egress down the street. Dodd also testified, credibly, that none of the four officers who arrived to assist stood directly in front of Fields when they came upon Fisher and Fields on Roxbury Street. As Fields' demeanor had changed during the course of his one-on-one conversation with Fisher, his demeanor changed once the officers arrived (e.g., Fields said something to the effect to Officer Fisher that "your boys are here now") and he appeared agitated.

After the arrival of the other officers, Fields went to put the cell phone he had been carrying into his front pocket. When he lifted up his long, white T-shirt to do so, both Officers Fisher and Dodd saw what appeared to be the clip of a pocket knife at his front pocket. Upon this sighting, Officer Dodd moved in front of Fields, explaining that Fields had a knife that needed to be removed from his person and that he was going to pat-frisk him. As the officer moved his hand toward Fields to do so, Fields pushed his hand away. Officer Dodd moved toward him again to make another attempt and Fields then slapped Officer Dodd's hand away. Upon Officer Dodd's request for assistance, two of the other officers, Officers Fisher and

4

Hunter, moved in to assist by taking each of Fields' wrists and securing his arms so that Officer Dodd could remove the knife. With Officers Fisher and Hunter assisting in this way, Officer Dodd did a pat-frisk of Fields and removed the knife, but also felt a firearm in Fields' waistband. Dodd then had Officers Fisher and Hunter handcuff Fields and, after some struggle with Fields, Officer Dodd removed the firearm from his waistband. Fisher secured the gun and Dodd took Fields to the police wagon. Later during booking, Fields made an unsolicited statement, in the presence of Sergeant McCarthy that he carried a gun to protect himself from police after someone was shot in the South End. Fields was charged with various charges including trespassing, assault and battery on a police officer, resisting arrest, and various dangerous weapon and firearms charges.

## III. Discussion

**A. The Police's Interaction with Fields Began with a Consensual Encounter**

A key contention between the parties is when any seizure of Fields by the police occurred on September 12, 2012. It is well settled that there is no seizure implicating the Fourth Amendment where police make inquiries of individual. United States v. Drayton, 536 U.S. 194, 200-01 (2002) (noting that "[l]aw enforcement officers do not violate the Fourth Amendment's prohibition on unreasonable seizures merely by approaching individuals on the street or in other public places and putting questions to them if they are willing to listen"); see United States v. Cardoza, 129 F.3d 6, 15 (1st Cir. 1997); United States v. Sealey, 30 F.3d 7, 9-10 (1st Cir. 1994). Such a consensual encounter, unlike an investigatory stop that requires reasonable suspicion or an arrest that requires probable cause, "may be initiated without any objective level of suspicion." United States v. Gross, 662 F.3d 393, 398 (6th Cir. 2011) (internal quotations omitted). To find that any such encounter rose to a seizure, a court "must be able to conclude

that coercion, not voluntary compliance, most accurately describes the encounter." United States v. Smith, 423 F.3d 25, 28 (1st Cir. 2005) (citing United States v. Mendenhall, 446 U.S. 544, 553 (1980)). To make such a determination, the Court must look at the totality of circumstances, applying an objective, reasonable person standard: "whether the officer's words and actions would have conveyed [restriction of movement] to a reasonable person." California v. Hodari D., 499 U.S. 621, 628 (1991); Florida v. Bostick, 501 U.S. 429, 438 (1991) (noting that this objective standard "presupposes an innocent person"). That is, "a consensual encounter becomes a seizure when 'in view of all of the circumstances surrounding the incident, a reasonable person would have believed that he was not free to leave.'" Gross, 662 F.3d at 398-99 (quoting Mendenhall, 446 U.S. at 554). In making this determination, the Court may consider such factors as "the threatening presence of several officers, the display of a weapon by an officer, some physical touching of the person of the citizen, or the use of language or tone of voice indicating that compliance with the officer's request might be compelled." Mendenhall, 446 U.S. at 554; see Bostick, 501 U.S. at 439 (noting that "seizure analysis requires consideration of all relevant circumstances").

Here, Officer Fisher's initial interaction with Fisher was a consensual encounter. The officer asked Fields what was going on and where he was headed. Cardoza, 129 F.3d at 15 (finding no seizure even where officers asked defendant a "more demanding and pointed" question than in Sealey including "why are you out at this time of night?" and did so after driving the wrong way down a one-way street indicating the officers' intention to make contact with the defendant); Sealey, 30 F.3d at 8-10 (finding no seizure where officer shouted "what's up" and, in response, the defendant fled). Fields' agitation and unsolicited commentary about his discomfort around police and the police having shot someone in the South End during this one-

6

on-one interaction caused Fisher to summons backup assistance from other officers. The defense argues that the arrival of the other officers turned this encounter into a stop and seizure. Although Officers Fisher and Dodd gave different accounts of where the officers were standing when they arrived, the totality of circumstances indicate that a seizure, necessitating at least reasonable suspicion, did not occur at this juncture. Whether the officers were standing as Officer Fisher indicated or as Officers Dodd indicated, compare Exh. B (chalk reflecting Officer Fisher's testimony) with Exh. C (chalk reflecting Officer Dodd's testimony), it remained the case that even upon the arrival of the other officers, Officer Fisher was the only one talking (and there was no evidence that the officer accused Fields of any wrongdoing and, in fact, Fields was the one who raised the issue of a search), he had made no commands to Fields, no requests for identification, his firearm remained holstered and none of the officers spoke to Fields or came to stand directly in front of Fields. Fields still also had a means of egress. See Smith, 423 F.3d at 30 (holding that there was no seizure and rejecting the district court's finding that "effectively [the police] surrounded [the defendant]" where the "evidence established that [the officers] stood where they had to, given that the telephone pole was in front of [the defendant], and that [the defendant] could have moved in a variety of directions"). That is, whether Officer Fisher's memory of the positioning of the officers controls or that of Officers Dodd's does, see Exhs. B-C, it remains the case that the officers, to assist Officer Fisher, had to stand somewhere in his vicinity and could only do so around or behind the car and Fields still had point of egress either up or down, respectively, the street. Moreover, although there were now multiple officers on the scene, such presence does not automatically convert the encounter into a seizure, see United States v. Goddard, 491 F.3d 457, 461 (D. C. Cir. 2007) and that is particularly true here where

only a single officer, Officer Fisher, had any active interaction with Fields before the spotting of the knife on his person.

At this point, there was still no show of authority by the police. Even in the absence of any command by the police, Fields continued to display agitation and to comment on his discomfort with the police. When he went to put his cell phone in his pocket, both Officers Fisher and Dodd credibly testified that they saw the clip of a knife in his pocket. As Officer Dodd moved in to remove the knife,[1] advising Fields that he was going to do so as he attempted to do so, Fields swatted his hand away on the first attempt and again as the officer made a second attempt to do so. It was only after Officer Dodd had the assistance of other officers in holding Fields that he was able to remove the knife.

**B. Seizure of Fields Upon Removal of Knife**

The government argues that even as Officer Dodd's initial attempts to remove the knife were a show of authority, there was no seizure of Fields until he submitted to such authority. That is, there is only a seizure if there is a show of force by the police and the defendant submits to that authority. Hodari D., 499 U.S. at 629; see, e.g., United States v. Holloway, 499 F.3d 114, 117 (1st Cir. 2007) (finding no seizure where officers ordered the defendant Holloway not to move, he ran, removing and attempting to discard a firearm from his waistband as he ran since he "never submitted to the officers' show of authority" and, therefore, "was not actually seized until the officers physically overpowered and handcuffed him"); Sealey, 30 F.3d at 10 (finding

---

[1] In addition to Officer Dodd' testimony about being aware that it is a crime to carry a dangerous weapon while wanted on warrants, see discussion below, Officer Dodd also testified that he was aware that there was a city ordinance prohibiting the carrying of a knife that is more than 2.5" long. Officer Dodd also testified that he observed the indentation of the knife and believed that the knife was more than 2.5" long, but even if he had not so testified, I credit his testimony that he was going to remove given his knowledge of the ordinance and the unfolding observations about Fields' statements about the police and agitation.

8

no seizure where the defendant "resisted [officer], . . . ran away, and ignored any authority that the officer manifested").

Here, even as Officer Dodd announced that he was going to remove the knife and moved into to do so, Fields did not submit to this action as he swatted away the officer's hand not once, but twice. It was only after this resistance and two other officers holding his arms to allow Officer Dodd to remove the knife that there was a seizure. On this record, the officer who felt what appeared to be a firearm was justified in the pat-down given Fields' behavior including the assault and battery on Officer Dodd for which the officers now had probable cause to arrest. See United States v. Bizier, 111 F.3d 214, 217 (1st Cir. 1997) (where the police had probable cause to arrest on a charge of driving under the influence, the search of the defendant's person was a lawful search incident to arrest). Accordingly, there was no unlawful seizure in violation of the Fourth Amendment.

### C. **Inevitable Discovery**

As an alternative argument, the government argues that the police would have inevitably discovered the firearm on Fields' person if they had retrieved the knife from him, but there was no pat-frisk leading to the firearm at that time. Officer Dodd testified that if an individual is wanted on warrant(s) and has a knife, he can be arrested for being armed while wanted. See Mass. Gen. L. c. 269, § 10(b) (defining crimes including the crime of carrying a dangerous weapon "when arrested upon a warrant for an alleged crime") Accordingly, once a knife is found, as Officer Dodd explained, the standard procedure is for the police to obtain the person's identity and run it to see if he has any warrants pending. If warrants were discovered, then the defendant would have been arrested on this charge and incident to such arrest, the police would have searched him and (inevitably) found his firearm. The defense disputes that there would

have been grounds to make such a charge here where a folding knife would not necessarily constitute a "dangerous weapon" for the purposes of a 10(b) charge under state law. Compare Commonwealth v. Turner, 59 Mass. App. Ct. 825 (2003) (noting that folding knives, at least those without a locking device, are typically not regarded as "dangerous per se") with Commonwealth v. Wynton W., 459 Mass. 745, 754 n. 5 (2011) (addressing this "stray comment" in Turner and concluding that whether a knife is "dangerous per se" turns on "whether the knife is 'designed for the purpose of bodily assault or defense' and 'to produce death or great bodily harm,' or whether it has some other useful purpose and is only dangerous when used in a dangerous fashion"). Without resolving this issue unequivocally, the Court concludes that as the circumstances unfolded here, it was reasonable for the officers, at a minimum, to believe that the knife observed and seized here would constitute a dangerous weapon for the purposes of § 10(b) charge where Fields, who was agitated and expressing distrust and displeasure with police, was wearing it on his waistband where it was concealed, but readily accessible. That is, on this record, the Court agrees that the record supports the conclusion that if the police had otherwise seized the firearm, discovered the outstanding warrant for Fields' arrest, they would have had probable cause to charge him with being armed while wanted and would have inevitably recovered the firearm during any pat-frisk incident to his arrest on that charge.

**IV. Conclusion**

For all of the aforementioned reasons, the Fields' motion to suppress, D. 40, is DENIED.

**So Ordered.**

/s/ Denise J. Casper
United States District Judge